UNTIED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION (AKRON)

| | | |
|---|---|---|
| ALAN KOZAK, et al., | : | |
| | : | |
| Plaintiffs, | : | Case No. 5:22-cv-02018 |
| | : | |
| v. | : | |
| | : | |
| ARCHER-DANIELS-MIDLAND CO., | : | |
| dba ADM ANIMAL NUTRITION, et al, | : | |
| | : | |
| Defendants. | : | |

**ARCHER DANIELS MIDLAND COMPANY'S ANSWER AND AFFIRMATIVE
DEFENSES TO PLAINTIFFS' COMPLAINT AT LAW**

Defendant, Archer Daniels Midland Company dba ADM Animal Nutrition [1]("ADM")

through its attorneys, JOHNSON & BELL, LTD, submits its Answer and Affirmative Defenses to

Plaintiffs' Complaint at Law, in the captioned case, and state as follows:

INTRODUCTION

1.      This case involves a dangerously defective product--milk replacer. Kozak, in

justifiable reliance on Defendants' representations, purchased custom made milk replacer, which

Defendants purported to specifically customize for Kozak's calves. The milk replacer was fed to

117 calves and caused scours in 111, resulting in the death of 39 calves and causing permanent

damage to those that survived. The surviving calves have deformities and will grow up riddled

with health issues and only able to produce milk at a fraction of their genetic potential, vastly

reducing Plaintiffs' future profits for milk production, and plummeting the value of the calves as

viable livestock. This has caused, and will continue to cause, catastrophic damage to Kozak's dairy

---

[1] At this time, counsel is not filing a responsive pleading for Kevin Steele given the Court's Show Cause Order (Dckt. 10) as that Order addresses the same issues that Steele would raise in a Rule 12 motion. Steele has requested an extension of time to file a responsive pleading connected to the Court's ruling on the remand issue.

farm, which is nationally recognized for its top-notch care of its animals and its high-quality products.

**ANSWER:**     **ADM denies the allegations of this Paragraph.**

### PARTIES, JURISDICTION, AND VENUE

2.      Alan and Sharon Kozak are husband and wife and reside in Monroe Township, Holmes County, Ohio.

**ANSWER:**     **ADM lacks information sufficient to form a belief as to the accuracy of these allegations and therefore, denies same.**

3.      Kozak's Jersey Dairy, LLC dba Clover Patch Dairy is a limited liability company organized under the laws of the State of Ohio.

**ANSWER:**     **According to a public records search, ADM admits these allegations.**

4.      Upon information and belief, Defendant ADM is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Chicago, Illinois.

**ANSWER:**     **ADM admits these allegations.**

5.      ADM is registered to do business in Ohio under the fictitious name of ADM Animal Nutrition.

**ANSWER:**     **ADM admits this allegation.**

6.      At all times relevant, ADM has had a plant location in Sugarcreek, Ohio.

**ANSWER:**     **ADM admits that it has a plant in Sugarcreek, Ohio but lacks information sufficient to form a belief as to what constitutes "all times relevant" and therefore, denies same.**

7.      Upon information and belief, Defendant Milk Specialties is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Minnesota.

2

**ANSWER:**     **ADM lacks information sufficient to form a belief as to the allegations in this Paragraph and therefore, denies same.**

8.     Upon information and belief, Defendant Kevin Steele ("Steele") is an individual whose residence is located in the Village of Creston, Medina County, Ohio. At all relevant times, Steele was either an employee or independent contractor of Defendant ADM.

**ANSWER:**     **ADM admits that Kevin Steele resides in Creston and that he is an employee of ADM but denies the remaining allegations in this Paragraph.**

9.     This Court has personal jurisdiction over the Defendants because Defendants reside in the State of Ohio (as is the case for Defendant Steele) and directly or through Defendants' agents have engaged in sufficient contacts with the State of Ohio establishing personal jurisdiction such as:

   a.     transacting business in Ohio;
   b.     contracting to supply services or goods in Ohio;
   c.     causing tortious injury by an act or omission in Ohio;
   d.     causing tortious injury in Ohio by an act or omission outside Ohio when the Defendant regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed in Ohio; and
   e.     causing tortious injury in Ohio to any person by an act outside Ohio committed with the purpose of injuring persons, when the Defendant might reasonably have expected that some person would be injured thereby in Ohio.

**ANSWER:**     **This Paragraph seeks a legal conclusion to which no response is required. Further responding, ADM admits that it currently transacts business in Ohio but denies the remaining allegations.**

10.     Venue is appropriate in this Court under Ohio Rule of Civil Procedure 3(C)(3), (5), (6), and/or (12).

**ANSWER:**     **This Paragraph seeks a legal conclusion to which no response is required.**

**FACTUAL BACKGROUND**

3

11.    Kozak's dairy farm, known as Clover Patch Dairy, is a recognized national leader in the dairy industry.

**ANSWER:    ADM lacks information sufficient to form a belief as to the truth of the allegations and therefore, denies same.**

12.    Since Kozak and his wife began Clover Patch in 1991, they have built the business from the ground up and have established Clover Patch as a leader in Jersey cattle herd management and milk production.

**ANSWER:    ADM lacks information sufficient to form a belief as to the truth of the allegations and therefore, denies same.**

13.    Clover Patch has been featured favorably in industry publications such as the Jersey Journal, Hoards Dairyman, and Dairy Agenda Today, which have recognized the Kozaks' business acumen, herd management, and impressive herd genetics.

**ANSWER:    ADM lacks information sufficient to form a belief as to the truth of the allegations and therefore, denies same.**

14.    When Jersey calves are young, they are fed milk replacer.

**ANSWER:    ADM admits that when Jersey calves are young, they can be fed milk replacer but denies the allegation as phrased.**

15.    Milk replacers are special mixtures that are used for growing young animals, including calves in the first few months of their lives. This is the critical time period for the most significant development and growth for young calves.

**ANSWER:    ADM admits that milk replacers can be special mixtures that are used for growing calves during the first few months of their lives but denies the remaining allegations.**

16.    If calves fail to grow properly during these first few months of their lives, or suffer sickness, it can result in significant future health issues, and severely reduced milk production later in life.

4

**ANSWER:**     **ADM lacks information sufficient to form a belief as to the truth of the allegations as phrased and therefore, denies same.**

17.     Defendant Steele regularly sold animal feed products to Kozak.

**ANSWER:**     **ADM admits that ADM sold animal feed products to Kozak with the assistance of its employee, Kevin Steele.**

18.     Kozak had previously conducted significant business with Steele, who had regularly sold products coming from ADM's Sugarcreek, Ohio plant to Clover Patch.

**ANSWER:**     **ADM admits that Kozak previously conducted business with ADM with the assistance of its employee, Kevin Steele, with some products coming from the Sugarcreek plant.**

19.     In the Fall of 2020, Steele came out to Kovak's Clover Patch farm along with Milk Specialties' Calf Technical Specialist Elizabeth Marvel ("Marvel").

**ANSWER:**     **With the understanding that Steele was an employee of ADM, ADM admits these allegations.**

20.     Steele and Marvel spoke to Kozak about a custom milk replacer, which ADM would supply in conjunction with Milk Specialties, which manufactured it.

**ANSWER:**     **With the understanding that Steele was an employee of ADM, ADM admits these allegations.**

21.     Steele and Marvel represented to Kozak that the milk replacer would be customized for Kozak's Jersey calves and it would help their growth and later milk production.

**ANSWER:**     **ADM denies that Steele made the representations as phrased.**

22.     Because Kozak had done business in the past with Steele and ADM, Kozak believed he could rely on Steele's and Marvel's affirmative representations that the milk replacer would be safe and beneficial for Kozak's calves, and agreed to purchase it.

**ANSWER:**     **ADM lacks information sufficient to form a belief as to what Kozak believed and why and therefore, denies same.**

23. Upon information and belief, ADM supplied the product and used Milk Specialties to custom mix the product so it would conform to the specific needs of the Clover Patch calves.

**ANSWER:** **ADM denies these allegations as phrased but admits that the product shipped from an ADM facility.**

24. The initial invoice for the milk replacer is dated February 26, 2021. A true and accurate copy of the Invoice is attached hereto as Exhibit "A."

**ANSWER:** **ADM admits these allegations.**

25. The initial invoice stated the milk replacer was shipped on or about February 26, 2021, from Sugarcreek, Ohio to Kozak's Clover Patch dairy farm in Millersburg, Ohio.

**ANSWER:** **ADM admits these allegations.**

26. Subsequent deliveries of the milk replacer from ADM's Sugarcreek plant to the Kozak's Millersburg farm were made on or about March 25, 2021 and April 7, 2021, as represented in invoices dated March 25, 2021 and April 7, 2021 attached hereto as Exhibits "B-and "C."

**ANSWER:** **ADM admits these allegations.**

27. Within days of feeding the calves the milk replacer, the calves began to develop serious and life-threatening medical issues.

**ANSWER:** **ADM lacks information sufficient to form a belief as to the truth of these allegations and therefore, denies same.**

28. Out of 117 calves fed the milk replacer, 111 calves ended up being treated for scours.

**ANSWER:** **ADM lacks information sufficient to form a belief as to the truth of these allegations and therefore, denies same.**

29. Scours is a form of severe and life-threatening diarrhea that afflicts livestock, which can cause death from dehydration.

**ANSWER:      ADM admits that scours is a diarrhea that afflicts livestock but denies the remaining allegations as generally pled.**

30.      When calves have scours, it impairs average daily weight gain, which results in the calf not developing to its full genetic potential.

**ANSWER:      ADM denies the allegations as generally pled.**

31.      Where calves are underweight due to scours, it results in significantly reduced milk production later in life  -in other words, when a calf has significant scours and survives, it will still never produce the quantity of milk it could have if its development had not been impaired.

**ANSWER:      ADM denies the allegations as generally pled.**

32.      When Kozak informed the Defendants about the calves' sickness and asked for guidance, Defendants neither advised Kozak to stop feeding the calves the milk replacer nor undertook any other mitigating efforts.

**ANSWER:      ADM denies these allegations.**

33.      In an attempt to mitigate the damage being done to the calves, Kozak ultimately switched the calves' feeding from the ADM-Milk Specialties milk replacer to an alternate milk replacer.

**ANSWER:      ADM lacks information sufficient to form a belief as to the truth of these allegations and therefore, denies same.**

34.      The switch to the alternate milk replacer significantly reduced the frequency and intensity of the scouring symptoms.

**ANSWER:      ADM lacks information sufficient to form a belief as to the truth of these allegations and therefore, denies same.**

35.      In a further effort to identify the cause of the scours, Kozak also switched three healthy bull calves from whole milk to the milk replacer.

**ANSWER:**     **ADM admits that the Kozaks advised them of this effort but lacks information sufficient to form a belief as to the truth of these allegations and therefore, denies same.**

36.     After the change, all three bull calves became ill with scours within several days. Two of the bull calves survived after being switched back to whole milk, but one did not survive.

**ANSWER:**     **ADM admits that the Kozaks advised them of this effort but lacks information sufficient to form a belief as to the truth of these allegations and therefore, denies same.**

37.     Forty-two calves, which were dangerously dehydrated, were treated with intravenous fluids—some multiple times to attempt to stave off dehydration and death.

**ANSWER:**     **ADM lacks information sufficient to form a belief as to the truth of these allegations and therefore, denies same.**

38.     Despite Kozak's best efforts to save the calves, 39 have died prematurely, as a direct and proximate result of feeding them the milk replacer.

**ANSWER:**     **ADM denies these allegations.**

39.     The surviving calves are riddled with health issues—they lack uniformity, are smaller, unhealthy, and slower growing than other calves at Clover Patch.

**ANSWER:**     **ADM denies these allegations.**

40.     The milk production of the surviving calves will be severely impaired, and their value as livestock has plummeted.

**ANSWER:**     **ADM denies these allegations.**

41.     After the incident, ADM and Milk Specialties conducted testing on the milk replacer.

**ANSWER:**     **ADM admits that testing of the milk replacer was done after reports from Kozak.**

42.     The testing results showed at least three areas of concern:

1.      Direct fed microbials (DFM) were 255% of the formulation, and 600% the European approved rate.
2.      Two-thirds of the DFMs were Enterococcus faccium "E faecium," which was not on the product label.
3.      The fat was less than 24% but labeled at 25%.

**ANSWER:     ADM denies that these allegations accurately reflect the complete results of the testing.**

43.     There were quality control issues during the production of the milk replacer by Milk Specialties.

**ANSWER:     ADM lacks information sufficient to form a belief as to these allegations and therefore, denies same.**

44.     The defects in the manufacture and/or design of the milk replacer directly and proximately caused scours to develop in Kozak's calves.

**ANSWER:     ADM denies these allegations.**

45.     Defendant Milk Specialties knew or should have known that quality control issues led to a dangerously defective product.

**ANSWER:     ADM lacks information sufficient to form a belief as to these allegations and therefore, denies same.**

46.     Defendant Milk Specialties, knew or should have known that because the milk replacer was dangerously defective, it would lead to death or serious injury in Kozak's calves.

**ANSWER:     ADM lacks information sufficient to form a belief as to these allegations and therefore, denies same.**

47.     Defendants chose to recklessly disregard the danger of the dangerously defective milk replacer and deliver it to Kozak, without warning Kozak of the dangerous defects.

**ANSWER:     ADM denies these allegations.**

48.     Even after learning that Kozak's calves had become sick after feeding from the ADM-Milk Specialties' milk replacer, Defendants provided no warning or mitigating efforts.

**ANSWER:     ADM denies these allegations.**

**COUNT ONE**
**DEFECTIVE MANUFACTURE (DESIGN DEVIATION) R.C. 2307.74**
**AGAINST MILK SPECIALTIES**

This claim is not directed at ADM and therefore, it refrains from answering said claim.

**COUNT TWO**
**DEFECTIVE DESIGN R.C. 2307.75**
**AGAINST MILK SPECIALTIES**

This claim is not directed at ADM and therefore, it refrains from answering said claim.

**COUNT THREE**
**DEFECTIVE MANUFACTURE (MANUFACTURER MISPRESENTATION)**
**R.C. 2307.77 AGAINST MILK SPECIALTIES**

This claim is not directed at ADM and therefore, it refrains from answering said claim.

**COUNT FOUR**
**NEGLIGENT SUPPLY R.C. 2307.78**
**AGAINST ADM AND STEELE**

88.     Plaintiffs hereby incorporate each paragraph of this Complaint as if fully rewritten herein.

**ANSWER:     ADM restates its responses to the foregoing paragraphs as if specifically restated herein.**

89.     ADM and Steele in the course of ADM's business, sold or otherwise participated in placing the milk replacer in the stream of commerce in Ohio.

**ANSWER:     ADM admits that it sold and shipped the milk replacer to Plaintiff.**

90.     ADM and Steele had a duty to Plaintiffs not to supply Plaintiffs with milk replacer which was dangerous and caused death and serious permanent health conditions to Plaintiffs' calves.

**ANSWER:** **ADM denies that Paragraph 90 accurately reflects any duties owed by it individually or through its employee, Steele.**

91.     ADM and Steele breached that duty by selling a product which was dangerously defective and resulted in death and serious permanent health conditions to Plaintiffs' calves.

**ANSWER:** **ADM denies these allegations.**

92.     ADM and Steele's supply of the milk replacer directly and proximately caused the injuries to the calves. But for ADM's and Steele's supplying the defective milk replacer, the calves' injuries would not have occurred, and calves contracting scours is within the scope of the risk of supplying defective milk replacer.

**ANSWER:** **ADM denies these allegations.**

93.     Plaintiffs were injured because 111 calves which ingested the milk replacer contracted scours-39 died, and the calves which recovered suffered permanent health issues.

**ANSWER:** **ADM denies these allegations.**

94.     As a direct and proximate result of ADM's and Steele's negligent supply of the milk replacer, Plaintiffs have suffered economic damage, including, but not limited to, significantly reduced milk production for the surviving calves, lost value of livestock for dead and damaged calves, veterinarian expenses, and cleaning and disposal expenses.

**ANSWER:** **ADM denies these allegations.**

95.     As a direct and proximate result of ADM's and Steele's negligent supply of the milk replacer, Plaintiffs have suffered damages well in excess of $25,000.00.

**ANSWER:** **ADM denies these allegations.**

**COUNT FIVE**
**SUPPLIER MISREPRESENTATION R.C. 2307.78**
**AGAINST ADM AND STEELE**

96.     Plaintiffs hereby incorporate each paragraph of this Complaint as if fully rewritten herein.

**ANSWER:     ADM restates its responses to the foregoing paragraphs as if specifically restated herein.**

97.     Steele and ADM were suppliers of the milk replacer under the Ohio Products Liability Act ("OPLA").

**ANSWER:     This Paragraph calls for a legal conclusion which does not require a response. Further responding, ADM denies that Steele would be considered a supplier.**

98.     Steele, as agent and/or employee of ADM, made representations to Plaintiffs that the milk replacer would be safe and beneficial to the calves, and would help their growth and development and milk production.

**ANSWER:     ADM admits that Steele was its employee but denies the remaining allegations as phrased.**

99.     Steele and ADM's representations were material to the transaction at hand because Plaintiffs would not have purchased the milk replacer for Plaintiffs' calves if the product were not safe and beneficial to them.

**ANSWER:     ADM denies these allegations.**

100.    The milk replacer did not conform to Steele and ADM's representations because it was unsafe and detrimental to the calves—adversely affecting their growth and development, and milk production.

**ANSWER:     ADM denies these allegations.**

101.    Plaintiffs justifiably relied on Steele and ADM's representations because they had purchased products from Steele and ADM many times in the past, and trusted Steele as an agent of ADM.

12

**ANSWER:** **This Paragraph calls for legal conclusions to which no response is required. Further responding, ADM admits that Plaintiff previously purchased product from it through its salesperson, Steele, but lacks information sufficient to form a belief as to the allegations regarding Plaintiff's trust of Steele and therefore, denies same.**

102.    As a direct and proximate result of Plaintiffs' reliance on the representations, Plaintiffs purchased the milk replacer and fed it to their calves, thus causing the scours and other damage to the calves.

**ANSWER:**    **ADM denies these allegations.**

103.    As a direct and proximate result of Steele and ADM's supplier misrepresentations, Plaintiffs have suffered economic damage, including, but not limited to, significantly reduced milk production for the surviving calves, lost value of livestock for dead and damaged calves, veterinarian expenses, and cleaning and disposal expenses.

**ANSWER:**    **ADM denies these allegations.**

104.    Upon information and belief, the representations were willful and wanton misconduct because of the flagrant disregard to the calves' safety.

**ANSWER:**    **ADM denies these allegations.**

105.    As a direct and proximate result of Steele and ADM's supplier misrepresentations, Plaintiffs have suffered damages well in excess of $25,000.00

**ANSWER:**    **ADM denies these allegations.**

106.    Because ADM and Steele acted with willful and wanton misconduct in flagrant disregard of the safety of Plaintiffs' calves, Plaintiffs are entitled to punitive damages under R.C. 2307.80.

**ANSWER:**    **ADM denies these allegations.**

107.    Additionally, Plaintiffs are entitled to attorney's fees and costs as a result of Defendants' misconduct.

**ANSWER:    ADM denies these allegations.**

## COUNT SIX
## BREACH OF CONTRACT
## AGAINST ADM AND MILK SPECIALTIES

108.    Plaintiffs hereby incorporate each paragraph of this Complaint as if fully rewritten herein.

**ANSWER:    ADM restates its responses to the foregoing allegations as if specifically restated herein and further states that it answers the following allegations only as to ADM.**

109.    Defendants ADM and Milk Specialties materially breached the contract with Plaintiffs by supplying a nonconforming, defective product—milk replacer, which was not suitable for consumption by Plaintiffs' calves.

**ANSWER:    ADM denies these allegations.**

110.    By supplying a nonconforming, defective product, Defendants failed to perform their obligations and violated the contract.

**ANSWER:    ADM denies these allegations.**

111.    Plaintiffs performed all obligations required of them under the contract.

**ANSWER:    ADM denies these allegations.**

112.    Defendants' breach directly and proximately caused Plaintiffs to suffer compensatory damages, including incidental damages, including expenses in caring for the sick and dying calves, disposal costs, veterinary care, and consequential damages in lost profits for reduced milk production.

**ANSWER:** **ADM denies these allegations.**

113. Plaintiffs' total compensatory damages are in excess of $25,000.00.

**ANSWER:** **ADM denies that Plaintiff is entitled to any compensatory damages.**

**COUNT SEVEN**
**BREACH OF EXPRESS WARRANTY**
**AGAINST ADM AND MILK SPECIALTIES**

114. Plaintiffs hereby incorporate each paragraph of this Complaint as if fully rewritten herein.

**ANSWER:** **ADM restates its responses to the foregoing allegations as if specifically restated herein and further states that it answers the following allegations only as to ADM.**

115. Upon information and belief, Defendants made express representations to Plaintiffs that the milk replacer would be custom tailored to the Plaintiffs' calves to facilitate their growth and development and later milk production.

**ANSWER:** **ADM lacks information sufficient to form a belief as to these allegations given the lack of specificity and therefore, denies same.**

116. Defendants breached their express warranty when they delivered milk replacer that adversely affected the Plaintiffs' calves by causing scours in 111 calves, killing 39, and condemning the rest to significant health problems, reduced growth, and significantly reduced future milk production.

**ANSWER:** **ADM denies these allegations.**

117. The defective milk replacer did not conform to Defendants' express warranties.

**ANSWER:** **ADM denies these allegations.**

118. Defendants' breach directly and proximately caused Plaintiffs to suffer compensatory damages including incidental damages, including expense in caring for the sick and dying calves, disposal costs, veterinary expenses, and consequential damages, which Defendants

at the time of contracting knew and which could not be reasonably prevented such as decreased value in the calves as livestock and lost profits from reduced milk production.

**ANSWER:    ADM denies these allegations.**

**COUNT EIGHT**
**BREACH OF IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE**
**AND/OR MERCHANTABILITY**
**AGAINST ADM AND MILK SPECIALTIES**

119.    Plaintiffs hereby incorporate each paragraph of this Complaint as if fully rewritten herein.

**ANSWER:    ADM restates its responses to the foregoing allegations as if specifically restated herein and further states that it answers the following allegations only as to ADM.**

120.    Defendants supplied milk replacer that was not merchantable.

**ANSWER:    ADM denies these allegations.**

121.    At the time of contracting, Defendants had reason to know that the milk replacer was specifically for the benefit of the calves' growth and development and milk production, and that Plaintiffs were relying completely on Defendants' representations that this milk replacer would be safe and beneficial to the calves.

**ANSWER:    ADM denies these allegations.**

122.    Defendants breached their implied warranties of fitness for particular purpose and/or merchantability when they delivered Plaintiffs the defective nonconforming milk replacer.

**ANSWER:    ADM denies these allegations.**

123.    Defendants' breach directly and proximately caused Plaintiffs to suffer compensatory damages including the full purchase price, incidental damages, including expense in caring for the sick and dying calves, disposal costs, veterinary expenses, and consequential

16

damages which Defendants at the time of contracting knew and could not reasonably be prevented, such as decreased value of the calves as livestock and lost profits from reduced milk production.

**ANSWER:**    **ADM denies these allegations.**

WHEREFORE, as a result of the foregoing, Plaintiffs demand judgment against Defendants Archer-Daniels-Midland Company, dba ADM Animal Nutrition, Kevin Steele, and Milk Specialties Company, jointly and severally, as follows:

1. For compensatory damages in excess of $25,000.00;

2. An award of punitive damages in an amount to be determined at trial;

3. Reasonable attorneys' fees;

4. Costs of this action;

5. And any and all other relief as this Court deems just and equitable.

**ANSWER: Wherefore, ADM denies that Plaintiffs are entitled to any judgment in their favor and any relief whatsoever.**

## AFFIRMATIVE DEFENSES
### FIRST AFFIRMATIVE DEFENSE – FAILURE TO MITIGATE

1. Plaintiffs claim losses in this case.

2. Plaintiffs knew or should have known ways to reduce the claimed losses and future losses.

3. Plaintiffs failed to undertake efforts to reduce or mitigate the claimed losses.

WHEREFORE, ADM requests judgment in its favor precluding or limiting Plaintiffs' claimed losses.

17

## SECOND AFFIRMATIVE DEFENSE – SOLE PROXIMATE CAUSE

1.      Plaintiffs claim losses related to the effect of milk replacer on the herd or portions thereof.

2.      Another party or parties bore a duty to Plaintiffs relative to products, services or care.

3.      The sole proximate cause of Plaintiffs' losses was the actions or inactions of others parties or non parties as it related to their products, activities or services.

WHEREFORE, ADM requests judgment in its favor and against Plaintiff.

## THIRD AFFIRMATIVE DEFENSE – CONTRIBUTORY NEGLIGENCE

1.      Plaintiffs claim losses related to the effect a milk replacer had on the herd or portions thereof.

2.      Before, during and after Plaintiffs' administration of the subject milk replacer, Plaintiffs operated and maintained the farm at which all livestock were kept.

3.      Before, during and after Plaintiffs' administration of the subject milk replacer, Plaintiffs bore a duty to properly maintain and care for the farm and all livestock.

4.      Plaintiffs failed to adequately maintain and care for the farm and/or herd.

5.      Plaintiffs' failures proximately caused the claimed losses.

WHEREFORE, ADM requests judgment be entered in its favor and against Plaintiffs.

## FOURTH AFFIRMATIVE DEFENSE – CONTRACTUAL LIMITATION ON DAMAGES

1.      Plaintiffs entered into agreements in the form of purchase orders, invoices, terms, conditions, and/or order confirmations.

2.      The terms and conditions which are part of the agreements include a limitation of remedies.

18

3.      That limitation controls Plaintiffs available damages.

WHEREFORE, ADM requests, in the event an award is entered in Plaintiffs' favor, that the Court enter judgment limiting or reducing Plaintiffs' award pursuant to the applicable agreement(s).

## FIFTH AFFIRMATIVE DEFENSE – CONTRACTUAL STATUTE OF LIMITATIONS

1.      Plaintiffs entered into agreements in the form of purchase orders, invoices, terms, conditions, and/or order confirmations.

2.      The terms and conditions which are part of the agreements include a statute of limitations.

3.      That limitation controls the time Plaintiff had to file any action.

4.      That limitation period expired prior to Plaintiffs' filing of this action.

WHEREFORE, ADM requests that this Court dismiss this matter based on Plaintiffs' failure to comply with the contractual statute of limitations.

Dated: December 8, 2022                              Respectfully submitted,


                                                    /s/ Hugh E. McKay
                                                    Hugh E. McKay (0023017)
                                                    PORTER WRIGHT MORRIS & ARTHUR
                                                    LLP.
                                                    950 Main Avenue., Suite 500
                                                    Cleveland, OH 44113
                                                    Tel. 216.443.2504
                                                    hmckay@porterwright.com

                                                    Christopher K. Riedel (00101707)
                                                    PORTER WRIGHT MORRIS & ARTHUR
                                                    LLP.
                                                    41 South High Street
                                                    Suites 2800-3200
                                                    Columbus, OH 43215
                                                    Tel. 614.227.2000
                                                    criedel@porterwright.com

and

Stephen P. Ellenbecker (admitted pro hac vice)
Michael R. Sherer
JOHNSON & BELL, LTD.
33 W. Monroe St., Suite 2700
Chicago, Illinois 60603
Phone: (312) 372-0770
Fax: (312) 372-9818
ellenbeckers@jbltd.com
shererm@jbltd.com
Firm ID#06347

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2022, **Defendant, Archer Daniels Midland Company's Answer and Affirmative Defenses to Plaintiffs' Complaint** was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

Stephen P. Ellenbecker (admitted pro hac vice)
Michael R. Sherer
JOHNSON & BELL, LTD.
33 W. Monroe St., Suite 2700
Chicago, Illinois 60603
Phone: (312) 372-0770
Fax: (312) 372-9818
ellenbeckers@jbltd.com
shererm@jbltd.com
Firm ID#06347